UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

CASE NO.   3:24-cr-146-MMH-MCR

v.

WILLIAM ERVIN DANIELS

_____

## DEFENDANT'S SENTENCING MEMORANDUM

Mr. William Ervin Daniels, age 45, is appearing before the Court for sentencing after having pleaded guilty to one count of distributing visual depictions of minors engaging in sexually explicit conduct (child pornography). Mr. Daniels is a testicular cancer survivor (as a result he was castrated). Mr. Daniels has no criminal history. Mr. Daniels suffers from severe depression related to abuse he suffered as a child, the loss of his mother, and his battles with cancer. Additionally, since childhood has suffered from significant learning disabilities (he struggles to read and write) that resulted in an avoidant, passive personality.

Mr. Daniels has accepted responsibility for the charged crime and respectfully asks this Court for a sentence of no more than 120 months in prison followed by a period of supervised release (the minimum is 5 years). Of course, he will suffer the collateral consequences of a being a felon and registered sex offender for the remainder of his life. No more than 120 months in prison is sufficient but

1

not greater than necessary to comply with the purposes of federal sentencing Further, it is anticipated he will complete BOP's residential sex offender treatment program, a daily, high-intensity program that lasts no less than 12 months, aiding his mental health and further decreasing already statistically low rates of recidivism.

## I.    Procedural History

On June 26, 2024, the FBI executed a search warrant on Mr. Daniels's home; his vehicle; and his person for his cell phone.  They also interrogated Mr. Daniels and he agreed to take a polygraph at the FBI in the coming days.  Mr. Daniels was detained for a period of time but then was released.

On July 11, 2024, Mr. Daniels participated in a polygraph at the FBI.  He had shown up two days earlier for the examination on July 9, 2024 and was turned away because he had reported on the wrong date.

Following the polygraph, the trained polygrapher told Mr. Daniels that he was lying about not having sexual contact with children.  He was then interrogated by the polygrapher who repeatedly rejected his denials that he had ever touched a child including his step-daughter.  Thereafter, Mr. Daniels, who was in special education his entire life and struggles to read and write, signed a statement typed by the FBI polygrapher which states that he did touch his step-daughter on two occasions when she was 8 or 9 years old.  The stepdaughter's date of birth is September 1995, making the incidents at least 20 years old.

2

Due to verbalized suicidal ideations, Mr. Daniels was arrested that same day pursuant to a criminal complaint. Mr. Daniels waived his rights to a preliminary hearing and detention hearing. He was indicted on July 17, 2024.

Mr. Daniels pleaded guilty on September 24, 2024 without a plea agreement to the sole count of the indictment.

The Presentence Investigation Report (hereafter "PSR") recommends a base offense level of 22 and the following specific offense characteristic enhancements:

§ 2G2.2(b)(2) - +2 for possessing at least one video or image involving prepubescent minors.

§ 2G2.2(b)(3)(F) - +2 for engaging in distribution.

§ 2G2.2(b)(4) - +4 for material that portrays sadistic or masochistic conduct or other depictions of violence.

§ 2G2.2(b)(5) - +5 for engaging in a pattern of activity involving the sexual abuse or exploitation of a minor.

§ 2G2.2(b)(6) - +2 for using a computer.

§ 2G2.2(b)(7)(D) - +5 for 600 or more images.

This resulted in an adjusted offense level of 42 and, with acceptance of responsibility, a total offense level of 39.

3

## II.    Outstanding PSR Objections

Mr. Daniels maintains his objection to the application of **USSG § 2G2.2(b)(5)** (+5 for engaging in a pattern of activity involving the sexual abuse or exploitation of a minor).   Mr. Daniels maintains that he never touched his stepdaughter and that his admissions to such acts under the pressure of the polygrapher were involuntary and false.

Second, Mr. Daniels asserts that the Court should not even consider the statements made to the polygrapher because such polygraph evidence is unreliable and routinely rejected by courts in sentencing hearings.

Finally, the alleged conduct (touching his stepdaughter on 2 occasions when she was 8 or 9) is unrelated to the charged offense both temporally and factually and is not relevant conduct to the offense of conviction (online trafficking of child pornography).

Mr. Daniels's signed statement was the culmination of a multi-hour polygraph-fueled interrogation during which Mr. Daniels's repeated denials were rejected.  Mr. Daniels struggles to read and write.  He has a very avoidant and passive personality, as attested to by Dr. Michael Nackashi, Psy.D, a clinical psychologist, in the attached evaluation.  He has no criminal history and had never been interrogated before the FBI.  He had shown up to the FBI field office two days prior, on the wrong date.  During his field interrogation on June 26, 2024, which was recorded, he had repeatedly rejected the FBI agent's claims that

4

he had touched a child and agreed to take the polygraph to establish that he never done so.  All of these factors weigh against the reliability and voluntariness of Mr. Daniels's alleged confession.

The undersigned counsel has not found any Eleventh Circuit caselaw addressing the use of polygraph results during sentencing hearings,[1] and counsel recognizes that voluntariness of a post-polygraph incriminatory statement may be seen as a separate issue. However, the PSR in this case does incorporate, over the objection of Mr. Daniels, polygraph results. See PSR ¶14 ("The defendant also showed signs of deception when asked about contact with other minors.").  Mr.

---

[1] The body of caselaw surrounding the use of polygraph results during sentencing has been deferential to the district court's judgment in assessing the reliability and weight to be given to a polygraph. In *United States v. Givens,* 767 F.2d 574, 585 (9th Cir.), *cert. denied,* 474 U.S. 953, 106 S. Ct. 321, 88 L. Ed. 2d 304 (1985), the Ninth Circuit affirmed the district court's refusal to consider polygraph evidence favorable to the defendant at the sentencing proceeding, which the court had ruled inadmissible at trial. The Ninth Circuit held that a trial judge possesses discretion to determine whether to consider polygraph testimony at sentencing. *Id*.  In *United States v. Francis,* 487 F.2d 968, 972 (5th Cir.1973), *cert. denied,* 416 U.S. 908, 94 S. Ct. 1615, 40 L. Ed. 2d 113 (1974), the Fifth Circuit held that the district court's refusal to consider at sentencing the result of a polygraph test was not error.  In *United States v. Messina,* 131 F.3d 36 (2d Cir. 1997), the defendant submitted polygraph evidence in an attempt to persuade the district court not to impose the "related conduct" sentencing enhancements.  After hearing testimony from the polygraph examiner on his qualifications, the testing procedure and his opinion that the defendant had answered the questions truthfully, the district court stated as follows:

> It was interesting to meet [the polygrapher] and hear his views. I still don't believe . . . let me put it this way, I believe that the rule of law which excludes polygraphs is the right one.

*Id*. at 42.  The Second Circuit affirmed without reaching the question of whether the district court could have relied upon the polygraph evidence if it had concluded it to be credible.

Daniels asserts that the statement he signed is part and parcel to the polygraph results, and this Court should not consider both the polygraph results and associated statements, essentially striking PSR ¶14 in its entirety.

Additionally, this Court should not apply the § 2G2.2(b)(5) because the alleged conduct of touching his stepdaughter when she was eight or nine years old (she is now 29 years old) is unrelated to the charged offense both temporally and factually and is not relevant conduct to the offense of conviction. Courts have historically viewed this enhancement as almost limitless temporally and factually, permitting the use of conduct that occurred in the distant past and conduct unrelated to the offense of conviction. In doing so, the Eleventh Circuit explicitly relied on § 2G2.2's commentary to uphold the application of the enhancement to old conduct unrelated to the offense of conviction. *United States v. McGarity*, 669 F.3d 1218, 1259-60 (11th Cir. 2012) (concluding that the Guideline commentary allowed application of § 2G2.2(b)(5) to conduct unrelated to the offense of conviction); *United States v. Turner*, 626 F.3d 566, 572 (11th Cir. 2010) (relying on Guideline commentary to reject appellant's claim that the "pattern of activity" must be between the past sexual abuse and the current offense: "Under the plain terms of the commentary, the only requirements for establishing a 'pattern of activity' are two more instances of sexual abuse or exploitation of a minor that are separate from one another."); *United v. Anderton*, 136 F.3d 747, 751 (11th Cir. 1998) (using Guideline commentary to

define "pattern of activity" to include "conduct unrelated to the offenses of conviction").

However, all of these cases that used the commentary to expand the reach of § 2G2.2(b)(5) pre-date the Eleventh Circuit's en banc decision in *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023). In *Dupree*, the court used *Kisor v. Wilkie*, 139 S. Ct 2400, 2415 (2019), to provide a gloss on prior precedent that the Guidelines commentary was authoritative; now the plain language of the Guideline applies and the commentary should only be consulted after all traditional tools of statutory construction are exhausted and the text of the Guideline remains genuinely ambiguous. 57 F.4th at 1273-76.

Following the holding of *Dupree*, in applying specific offense characteristics, this Court is limited to the unambiguous definition of relevant conduct in USSG § 1B1.3(a), which provides that relevant conduct is conduct relating to the offense of conviction "unless otherwise specified" in the Guideline. The plain language of § 2G2.2(b)(5) does not specify that any other definition of relevant conduct should be used to apply it. It is unambiguous with respect to expanding the reach of the "pattern of activity" beyond relevant conduct as defined by § 1B1.3(a) (conduct relating to the offense of conviction) – it simply does not provide for it, and because it is unambiguous in that regard this Court cannot use the Guideline commentary to expand the reach of the enhancement to

7

apply to Mr. Daniels's alleged, unrelated touching of his stepdaughter some 20 years ago.

Mr. Daniels's maintains his objection to the application of **USSG § 2G2.2(b)(4)**. The probation officer's addendum fails to establish a factual basis for this enhancement.

### III.    Sentencing Factors in 18 U.S.C. § 3553(a)

### A.  The Kinds of Sentences Available and the Advisory Sentencing Range – 18 U.S.C. § 3553(a)(3) and (4)

A conviction under 18 U.S.C. § 2252(a)(2) requires imprisonment for a minimum of five years and not more than twenty years. The Court is required to impose a term of supervised release of no less than five years and up to life.

### 1.  A district court is free to reject and vary categorically from a Guideline, based on a policy disagreement with that Guideline.

A district court may not presume that a Guidelines range is reasonable. *Gall v. United States*, 552 U.S. 38, 50 (2007). In the ordinary case, the Guidelines range "will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States,* 552 U.S. 85, 109 (2007). The Sentencing Commission was formed to promulgate the Guidelines based on empirical data, research and careful study of past sentencing practices. *Id.* at 96. But, where the Guidelines "do not exemplify the Commission's exercise of its characteristic institutional role," it would not be an abuse of discretion for a district court to conclude that the Guidelines yield a sentence greater than

necessary to achieve § 3553(a)'s purposes. *Id.* at 109-110; *see also Spears v. United States,* 555 U.S. 261, 263-266 (2009) (district courts are entitled to reject and vary categorically from the Guidelines based on a policy disagreement with those Guidelines, even when a particular defendant presents no special mitigating circumstances).

The Court's holdings in *Kimbrough* and *Spears* apply with equal force to other Guidelines, including U.S.S.G. § 2G2.2. *See, e.g., United States v. VandeBrake*, 679 F.3d 1030, 1037 (8th Cir. 2012) (district court was free to vary based on a policy disagreement with the antitrust Guidelines); *United States v. Henderson*, 649 F.3d 955, 962-963 (9th Cir. 2011) (the child pornography Guidelines are not the result of the Sentencing Commission's characteristic institutional role and district courts may vary from the Guidelines based on policy disagreement with them); *United States v. Dorvee*, 616 F.3d 174, 188 (2nd Cir. 2011) (*Kimbrough*'s holding applies with "full force" to USSG § 2G2.2); *United States v. Grober*, 624 F.3d 592, 609 (3rd Cir. 2010) (district court adequately explained its policy disagreement with § 2G2.2 and did not abuse its discretion when it varied from the Guidelines range).

## 2. USSG § 2G2.2 does not exemplify the Sentencing Commission's exercise of its characteristic institutional role.[2]

---

[2] For cases analyzing the history of the child pornography guidelines and the roles of the Sentencing Commission and Congress, see *United States v. Henderson*, 649 F.3d 955, 960-962 (9th Cir. 2011); *United States v. Grober*, 624 F.3d 592, 604-607 (3rd Cir. 2010); *United States v. Dorvee*, 616 F.3d 174, 184-186 (2nd Cir. 2010).

USSG § 2G2.2 is the product of arbitrary legislation by Congress, rather than the careful research and study of the Sentencing Commission.  From 1987 through the passage of the PROTECT Act in 2003, Congress has steadily ratcheted up the base offense level for § 2G2.2.[3]  United States Sentencing Commission, *The History of the Child Pornography Guidelines* (Oct. 2009) (hereafter cited as "U.S.S.C. History of CP")[4]; Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* (unpublished comment, Jan. 1, 2009) (hereafter cited as "Stabenow").[5]  The increases to the base offense level and the addition of new enhancements were often opposed by the Sentencing Commission.  U.S.S.C., History of CP at 18-21; Stabenow at 7-8, 20.  Some of the enhancements, such as the enhancement for number of images, and increases to the base offense level have no basis in empirical research.  U.S.S.C., History of CP at 42-48; Stabenow at 3, 19-23, 25-26.

The steady increase in the base offense level from 13 to 22 is paradoxical, because today's average pornography offender is like Mr. Daniels—a first time offender who has no involvement in the production of pornography involved in

---

[3] Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act, Pub. L. No. 108-21, 117 Stat. 650 (2003).

[4] http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/sex-offenses/20091030_History_Child_Pornography_Guidelines.pdf (last accessed December 16, 2024).

[5] http://www.ussc.gov/sites/default/files/pdf/training/annual-national-training-seminar/2016/report_stabenow.pdf (last accessed December 17, 2024).

the offense—whereas, in 1995, the Commission reported that a significant portion of pornography offenders had a criminal history involving sexual abuse or exploitation.  Stabenow at 13-15; Jelani Jefferson Exum, *Making the Punishment Fit the (Computer) Crime: Rebooting Notions of Possession for the Federal Sentencing of Child Pornography Offenses*, 16 Rich. J.L. & Tech. 8 at 32-33 (2010)[6]; see also, Wollert, Richard, The Implications of Recidivism Research and Clinical Experience for Assessing and Treating Federal Child Pornography Offenders: Written Testimony Presented to the U.S. Sentencing Commission (2012) ("The Guidelines have become ever more punitive in spite of their application to a current population that seems less dangerous than the population from the early 1990s").[7]

### 3.  Application of USSG § 2G2.2 to Mr. Daniels's case results in an unreasonable advisory Guideline range.

Courts must be particularly careful when determining an appropriate sentence under USSG § 2G2.2, because "they are dealing with an eccentric Guideline of highly unusual provenance which, unless carefully applied, can easily generate unreasonable results." *Dorvee*, 616 F.3d at 188; *see also United States v. D.M.*, 942 F.Supp.2d 327, 357 (E.D.N.Y. 2013) ("Rationales for child pornography Guidelines for non-production offenses have been shredded"). §

---

[6] http://scholarship.richmond.edu/cgi/viewcontent.cgi?article=1323&context=jolt (last accessed December 11, 2024).
[7] http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215-16/Testimony_15_Wollert_2.pdf (last accessed December 11, 2024).

2G2.2 includes several enhancements which are present in almost every case. These enhancements typically result in a 13-level increase to the base offense, which means that an offender with no criminal history in a typical possession and/or online distribution via social media case starts with a 35 adjusted offense level with a Guidelines range of 168 to 210 months, with the top end being over 17 years in prison. Thus, routine application of § 2G2.2 in cases like Mr. Daniels's means that unless a district court grants a downward variance, every offender is treated as the "worst of the worst," no matter their true culpability, and will be sentenced to near the statutory maximum in direct contradiction to a court's duty "to consider every convicted person as an individual," and to impose a sentence that is sufficient but not greater than necessary to satisfy the purposes of sentencing.

The four enhancements common to almost all cases are: 1) a two-level enhancement for pornographic material involving a minor under age twelve; 2) a four-level enhancement for material portraying sadistic or masochistic conduct or other depictions of violence; 3) a two-level enhancement for use of a computer; and 4) a five-level enhancement for possessing 600 or more images (with each video being counted as 75 images). *Dorvee*, 616 F.3d at 186; *Grober*, 624 F.3d at 607; *United States v. Diaz*, 720 F.Supp.2d 1039, 1041 (E.D. Wisc. 2010).

A look at data kept by the Sentencing Commission for fiscal years 2010 through 2023 best illustrates this point.[8]  The following table shows the frequency of each of the four enhancements expressed as a percentage of the total number of cases in which USSG § 2G2.2 was applied:

| Year | Victim Under Age 12 | Sadistic/Violent Images | Use of Computer | 600 images Or more |
|---|---|---|---|---|
| 2010 | 95.6% | 73.6% | 96.2% | 66.9% |
| 2011 | 95.3% | 79.4% | 97.4% | 70.9% |
| 2012 | 96.9% | 80.7% | 96.4% | 76.2% |
| 2013 | 96.1% | 82.8% | 95.3% | 79.0% |
| 2014 | 95.4% | 83.6% | 94.9% | 78.3% |
| 2015 | 94.5% | 82.6% | 94.4% | 76.1% |
| 2016 | 95.2% | 84.4% | 95% | 77.8% |
| 2017 | 94.1% | 71.2% / 10%* | 95.7% | 74.7% |
| 2018 | 94.1% | 67.1%/16.8%* | 96.6% | 76.7% |
| 2019 | 94.3% | 61.4% / 20.1%* | 95.8% | 75.6% |
| 2020 | 93.6% | 57% / 24.5%* | 94.2% | 73% |
| 2021 | 94.5% | 58.8% / 23%* | 96.1% | 73.2% |
| 2022 | 93.4% | 51.7% / 28.6%* | 96.6% | 72.5% |
| 2023 | 94.4% | 48.7% / 32.1%* | 97.1% | 76.6% |

---

[8] http://www.ussc.gov/research/data-reports/guideline (last accessed December 11, 2024).

| Year | Victim Under Age 12 | Sadistic/Violent Images | Use of Computer | 600 images Or more |
|------|---------------------|-------------------------|-----------------|--------------------|
|      |                     |                         |                 |                    |

\* Beginning in FY 2017, the statistics for the (b)(4) enhancement were divided between "sadistic or masochistic conduct or other forms of violence depicted" and "sexual abuse or exploitation of an infant or toddler depicted."

USSG § 2G2.2 and its enhancements that apply to nearly ever defendant result in custody ranges that are skewed toward the maximum sentence; therefore § 2G2.2 results in sentences that are not proportionate to an offender's culpability. Stabenow at 29; *United States v. Tutty*, 612 F.3d 128, 132 (2nd Cir. 2010) (the Guidelines make no distinction between the sentences for an ordinary first offender and the sentences for the most dangerous offenders). That is why the Sentencing Commission has recognized that § 2G2.2 must be revised.

### 4. The Sentencing Commission's 2012 and 2021 Reports to Congress recommended comprehensive revision of USSG § 2G2.2.

In 2012, the Sentencing Commission asked Congress for the authority to do a comprehensive revision of the child pornography Guidelines. United States Sentencing Commission, *Federal Child Pornography Offenses* at 322 (Dec. 2012) (hereafter referred to as "2012 Report to Congress").[9] The Commission noted that there has been a steady decrease in the rate of within-Guidelines-range sentences for non-production cases from 2004 (83.2 percent) to 2011 (32.7 percent). *Id.*, Executive Summary at ii. By 2011, 62.8 percent of sentences in

---

[9] http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf (last accessed December 11, 2024).

non-production cases were below-Guidelines-range sentences. *Id.*, Executive Summary at ii. From this data, the Commission concluded that "a growing number of courts believe that the current sentencing scheme in non-production offenses is overly severe for some offenders." *Id.*, Executive Summary at ii. The Commission also noted that most stakeholders in the federal criminal justice system believe the child pornography Guidelines are outmoded and feel that they "are left without a meaningful baseline from which they can apply sentencing principles" in non-production cases. *Id.*, Executive Summary at iii, quoting *United States v. Stern*, 590 F.Supp.2d 945, 961 (N.D. Ohio 2008). The report specifically acknowledged that many of the § 2G2.2 enhancements apply to most offenders and thus do not provide a meaningful way to assess culpability. 2012 Report to Congress, Executive Summary at ii-iii.

In 2021, the Commission doubled-down on its conclusion, providing another report to Congress that found sentencing guideline enhancements for non-production child pornography offenders have not kept pace with technological advancements, have resulted in increased sentencing guideline calculations, and, as a result of charging practices and courts frequently varying from the guidelines, have resulted in wide sentencing disparities amongst offenders. United States Sentencing Commission, *Federal Sentencing of Child Pornography Non-Production Offenses* (June 2021) (hereafter referred to as "2021 Report to Congress"). The 2021 Report to Congress referred to the statutory penalties and guideline structure as simply "outdated." Id.

15

**B.  The Need to Avoid Unwarranted Sentencing Disparities – 18 U.S.C. § 3553(a)(6)**

Many federal judges question whether USSG § 2G2.2 provides any guidance with regard to imposing reasonable sentences, while others adhere to the guideline in spite of the Sentencing Commission's research and analysis. Hamilton, M., *The Efficacy of Severe Child Pornography Sentencing: Empirical Validity or Political Rhetoric?* 22 Stan. L. & Pol'y Rev. 545, 559-569 (2011) (collecting cases reflecting divergent views on the guideline).  Data collected by the Sentencing Commission indicates that those judges who believe § 2G2.2 does not produce just sentences are in the majority.  In 2023, 1,408 people were sentenced under § 2G2.2. United States Sentencing Commission, *Quick Facts – Child Pornography Offenses, FY 2019 through FY 2023.*[10]  57.1% of those sentenced received a downward variance, with an average sentence reduction of 38.8%. Id.  Thus, paradoxically, in more than half of the cases across the country, the district court judges believed the guidelines sentence did not meet the goal of imposing a sentence sufficient but not greater than necessary to comply with the purposes of federal sentencing.  Further, the average sentence for individuals convicted of trafficking child pornography, like Mr. Daniels, was 148 months. Id. As a result, in Mr. Daniels's case, imposition of a below guideline range sentence

---

[10] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Child_Pornography_FY23.pdf (last accessed on December 11, 2024).

would avoid sentencing disparity, while a within guideline range sentence would promote disparity.

## C.  The nature and circumstances of the offense and the history and characteristics of the defendant – 18 U.S.C. § 3553(a)(1)

Possession and distribution of child pornography is undoubtedly a serious offense.  The children who are sexually exploited for purposes of promoting and producing child pornography suffer significant emotional and physical pain.  But technology has made these offenses exceedingly easier, and Mr. Daniels's offense conduct simply involved the use of a smart phone and frequently used social media applications.  As the 2021 Report to Congress assessed, "[t]echnological advancements have facilitated offenders' access to child pornography" and noted that all 2019 offenders "used mobile or digital means to acquire child pornography." 2021 Report to Congress at p. 31.   Mr. Daniels did send and receive images, but he was not running a business and there is no allegation that he produced child pornography or disseminated mass quantities for profit.  When caught by law enforcement, he admitted his wrong-doing and cooperated with the investigation, and quickly accepted responsibility before the Court.

### 1.  Mr. Daniels has a history of testicular cancer.

Mr. Daniels has had both of his testicles surgically removed.  His left testicle was removed in or around 2000 and his right testicle was removed in 2013.  He historically relied on testosterone gel to maintain his testosterone levels, but he had insurance issues and developed allergies to certain medications

and had trouble getting in to see the doctor for medication refills. As a result, at times his testosterone was severely low.

Mr. Daniels suffered from depression, embarrassment, and low self-esteem as a result of his castration. This added to his already avoidant and passive personality that resulted from his learning disabilities. Of note, his interest in child pornography began in or around the timeframe that his right testicle was removed and his mother became sick.

### 2. Mr. Daniels is a victim of childhood abuse.

Mr. Daniels grew up in a home where his father routinely beat his mother in front of him and his sister. At times, Mr. Daniels would attempt to protect his mother, and his father would direct his attention to Mr. Daniels. This occurred on a regular basis until Mr. Daniels was around age 18 and was physically big enough to stand-up to his father to stop the beatings. Developmental findings show that adults with adverse stressful childhood experiences tend to have anxious attachment and sexual compulsion. Aaron M., *The pathways of problematic sexual behavior: A literature review of factors affecting adult sexual behavior in survivors of childhood sexual abuse*, Sex Addict Compulsivity 19, 199–218 (2012).

### 3. Mr. Daniels had a close relationship with his mother, who passed in 2016 due to cancer.

Mr. Daniels was extremely close with his mother and saw himself as her protector. But he could not protect her from cancer. When his mother was

diagnosed with cancer, Mr. Daniels stopped working to take care of her. She passed in 2016 leaving a void in Mr. Daniels life. Mr. Daniels's wife provided in the attached letter that "William significantly changed after the death of his mother."

### 4. Mr. Daniels suffers from significant learning disabilities.

Mr. Daniels was in special education his entire schooling and earned a Special Education High School Diploma. Unfortunately, the school system has destroyed all evaluations, and the only records available are his diploma and transcripts. Nevertheless, as verified by Dr. Nackashi, Mr. Daniels struggles to read and write and associated embarrassment in school led to a very avoidant and passive personality and feelings of worthlessness.

### 5. Mr. Daniels suffers from severe depression.

Dr. Nackashi diagnosed Mr. Daniels with Persistent Depressive Disorder, With anxious distress, Early onset, With intermittent major depressive episodes, With current episode, Severe. It is clear that Mr. Daniels has had long-term mental health struggles beginning with his learning disabilities and abuse as a child and continuing through is cancer and death of his mother to his current legal troubles, and that this has reduced his self-worth. Studies have concluded that there may be a connection between stressful experiences, anxiety, and depression and pornography consumption. In addition, conflicting emotional experiences as well as identity problems significantly increase vulnerability to addictive sexual behavior and pornography consumption. Privara M.,

*Pornography Consumption and Cognitive-Affective Distress*, 22 J. Nerv. Ment Dis. 641–646 (2023).

### D.  The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense – 18 U.S.C. § 3553(a)(2)(A)

Federal criminal sentences are meant to reflect the seriousness of the offense; to promote respect for the law; to provide just punishment; to afford adequate deterrence to criminal conduct; to protect the public from the defendant's further crimes; and to rehabilitate the defendant.

The statutory maximum sentence for Mr. Daniels's offense is 20 years. However, he will suffer life-long consequences as a registered sex offender and felon.  The fact that he is a sex offender will be posted on the internet, and, in addition to the stigma that he will forever wear, he will undoubtedly experience difficulties in seeking employment and obtaining a residence.  These are not trivial consequences.  As one court put it: "To be adjudicated guilty necessarily results in denomination as a sex offender; automatically provided is a lifetime of continuous punishment—being marked as a pariah with severe restrictions on residence, movements, activities and associations.  Adding unnecessary, unduly long, periods of incarceration is inappropriate and it should be avoided." *United States v. R.V.*, 157 F.Supp.3d 207, 210 (E.D.N.Y. 2016).  Mr. Daniels asks this Court to consider the collateral consequences of his conviction in fashioning his sentence.

**E.  The need for the sentence imposed to afford adequate deterrence to criminal conduct – 18 U.S.C. § 3553(a)(2)(B)**

As noted above, the onerous consequences of sex offender registration should deter Mr. Daniels from committing any further misconduct.   When it comes to general deterrence, certainty of punishment is more important than severity of punishment. Tonry M., *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 30 (2006).  Increases in the severity of punishment seldom, if ever, prevent crime. *Id.* at 29; *see also United States v. Beiermann*, 599 F.Supp.2d 1087, 1103-1104 (N.D. Iowa 2009) (noting that while deterrence is a laudable goal, it "is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of"); *United States v. Kelly*, 868 F.Supp.2d 1202, 1207 (D. New Mex. 2012) ("The Court is aware of absolutely no evidence suggesting that increased penalties for the consumers of child pornography have decreased the swell of child pornography produced or posted to the internet, or deterred 'hands-on' abuses against children").

**F.  The need for the sentence imposed to protect the public from further crimes of the defendant – 18 U.S.C. § 3553(a)(2)(C)**

Researchers who have studied recidivist rates for child pornographers have consistently found low rates of reoffending.  A study of online child pornography offenders followed for a period of three and a half years reported the following recidivism rates: 5% of offenders were caught for a new sexual offense of any

kind; 3.4% were rearrested, recharged or reconvicted for a new child pornography offense; and 2.1% were rearrested, recharged or reconvicted for a new contact sexual offense.  Child Pornography Offender Characteristics and Risk to Reoffend, Testimony of Michael Seto before the U.S. Sentencing Commission on Federal Child Pornography Crimes.[11]

Other researchers have concluded that "the empirical literature does not put forward any evidence that the consumers of child pornography pose a considerably increased risk for perpetrating hands-on sex offenses." Endrass, J., *et al.*, (2009). *The Consumption of Internet Child Pornography and Violent and Sex Offending*.  BMC Psychiatry, 9, 43-50.[12]  This group of researchers studied 231 child pornography consumers to determine rates of recidivism (defined as reconviction, ongoing investigations and charges) during a six year follow-up period and found that 3.9% of the subjects recidivated for illegal pornography possession, 0.8% committed a "hands-on" sexual offense against a child, and 1.3% committed a violent offense. *Id.*  Not only are recidivism rates low, but there is little evidence of any direct impact of viewing child pornography on the commission of contact sexual offenses.  Hamilton, M., *The Efficacy of Severe Child Pornography Sentencing: Empirical Validity or Political Rhetoric?* 22 Stan. L. & Pol'y Rev. 545, 580 (2011).

---

[11] http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20120215-16/Testimony_15_Seto.pdf (last accessed December 16, 2024).
[12] http://www.biomedcentral.com/content/pdf/1471-244X-9-43.pdf (last accessed December 16, 2024).

Other than this offense, Mr. Daniels has been a law-abiding citizen. It is unlikely that he will reoffend.  His only prior contact with the criminal justice system involved a 1998 fishing without a license violation.  There is a correlation between criminal history points and recidivism, and offenders with zero criminal history points have the low recidivism rate. See United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* at 18 (Mar. 2016).  Additionally, an offender's age at the time of release is closely associated with recidivism, with the older the age, the lower rearrest rate. See United States Sentencing Commission, *The Effects of Aging on Recidivism Among Federal Offenders* Report (2017).  Mr. Daniels is currently 45 years old; with 120-month sentence and minimum five years supervised release, he will be in or near the release age group with the lowest recidivism rate (older than 60). Id.

### G.  Pertinent Policy Statements – 18 U.S.C. § 3553(a)(5)

In a letter to the Sentencing Commission following the issuance of its 2012 report to Congress, the Department of Justice acknowledged that § 2G2.2 is a flawed Guideline.  Although the Department did not agree with everything the Sentencing Commission found, the Department did agree that the two-level enhancement for use of a computer should be eliminated.  DOJ Letter at 12.[13] Although the DOJ concluded that the enhancement for the number of images

---

[13] https://www.justice.gov/sites/default/files/criminal/legacy/2013/07/11/2013annual-letter-final-071113.pdf (last accessed December 16, 2024)

possessed by the offender should remain, it agreed that the numeric thresholds should be increased.  DOJ Letter at 12.

**IV**. **Conclusion**

This Court should determine that Mr. Daniels's total offense level is, at most, 34.  With that total offense level and a criminal history category I based on his criminal history score of zero, his imprisonment guidelines would be 151-188 months.  The Court should then vary downward for the reasons set forth in this memorandum to a sentence of no more than 120 months.

**Attached Exhibits**

1. Statement of Regina Daniels
2. Diploma and School Records
3. Report of Dr. Michael Nackashi, Psy.D (filed separately under seal)
4. Urology Medical Records (filed separately under seal)

Respectfully submitted,

KORODY LAW, P.A.

_____

PATRICK K. KORODY, ESQUIRE
Florida Bar No. : 0107361
118 W. Adams Street, Ste 500
Jacksonville, FL 32202
Telephone: (904) 383-7261
Facsimile:  (904) 204-9548
Email: patrick@korodylaw.com
Attorney for Defendant